

FILED
CLERK, U.S. DISTRICT COURT

▮ 2 0 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                                  DEPUTY

Priority ✓
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

ENTERED
CLERK. U.S. DISTRICT COURT

JUL 2 1 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re DDi CORPORATION SECURITIES LITIGATION | Master File No. CV 03-7063 NM (SJHx) |
| This Document Relates To: ALL ACTIONS | (Consolidated with Nos. CV 03-7883; CV 03-7999; CV 03-8344; CV 04-0735) |
| THIS CONSTITUTES NOTICE OF ENTRY AS REQUIRED BY FRCP, RULE 77(d). | CLASS ACTION |
| | OPINION & ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT ⟨ 119, 120, 123 ⟩ |

## I. INTRODUCTION

This is a consolidated securities class action arising out of a February 14, 2001 secondary public offering of DDi Corporation ("DDi") common stock and convertible subordinated notes. On February 22, 2005, Plaintiffs filed a Second Amended Consolidated Class Action Complaint ("SAC") asserting claims under sections 11, 12(a)(2), and 15(a) of the Securities Act of 1933 against various persons and entities associated with DDi and/or this offering. Before the court are three motions to dismiss the SAC. For the reasons set forth below, these motions are GRANTED in part and DENIED in part.

145

## II. FACTUAL AND PROCEDURAL BACKGROUND

DDi specialized in creating prototype Printed Circuit Boards ("PCBs") on an expedited basis – often within 24 hours – for a premium price. SAC ¶¶ 5, 48-51. In addition to this "quick-turn prototyping," DDi provided "value-added services," including: (1) "[f]ast-track assembly services . . . for the attachment of materials to a small number of PCBs," and (2) "[p]re-production volume services . . . involv[ing] the generation and delivery of a small volume of units." Id. ¶¶ 5, 50. DDi's value-added services had a longer turnaround time and tended to return lower profit margins than its quick-turn prototyping. Id. ¶ 5.

On February 14, 2001, through a firm commitment underwriting, DDi and various shareholders issued 6 million shares of DDi common stock in a secondary public offering (the "Offering") that captured $132 million in proceeds. Id. ¶ 2.[1] As part of the Offering, DDi also issued 5.25% convertible subordinated notes (the "Convertible Notes"), due March 1, 2008, which had an aggregate principal amount of $100 million and generated $97 million in proceeds. Id. The Offering was made pursuant to a Form S-1 Registration Statement filed with the Securities and Exchange Commission ("SEC") on January 31, 2001, and a prospectus filed with the SEC in February 2001 (collectively, the "Prospectus"). Id. ¶ 3.

Plaintiffs allege that the Prospectus "contained false and misleading statements of material fact and omitted to state material facts necessary to make the statements [made therein] not misleading." Id. ¶ 62. Plaintiffs contend that the Prospectus was false and misleading on at least six grounds.

First, Plaintiffs assert that the financial reports included in the Prospectus were false and misleading because they were inflated by "accounting

---

[1] A firm commitment underwriting is one in which the underwriter agrees to buy all the shares to be issued and remains financially responsible for any securities not purchased. See Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1215 (1st Cir. 1996).

improprieties." Id. ¶ 79.  In particular, Plaintiffs allege that DDi, in violation of Generally Accepted Accounting Principles ("GAAP") and its own internal accounting policies, "recognized revenue on (1) the premature shipment of orders to clients . . . prior to the authorized delivery date; and (2) the shipment of orders from one DDi facility to another." Id. ¶ 80.  See also id. ¶¶ 86-87.

Second, Plaintiffs allege that the Prospectus "misrepresented the amount of DDi customers and failed to disclose that DDi had lost many of its historically largest customers." Id. ¶ 74.  The Prospectus provided:

> We currently have over 2,000 customers.  Our largest original equipment manufacturer customers in terms of net sales are Alcatel, Ericsson, IBM, Intel and Marconi Communications. . . .  We have achieved a net increase of approximately 200 customers since January 1, 2000, excluding increases resulting from acquisitions. . . .  We announced that during the fourth quarter we added over 100 new customers to increase our diversified customer base to more than 2,000 original equipment manufacturers and other electronic manufacturing service providers. . . .  We have been successful at retaining customers and have worked with our three largest customers since 1991.

Prospectus at 2, 3, 52.[2]  See also SAC ¶ 68.  Plaintiffs allege that in reality, DDi had 500 customers, and that "by the fourth quarter 2000, DDi was booking very little or no business from, inter alia, Alcatel, Redback, Intel, Marconi, 3Com, IBM, Nortel, and Cisco."  SAC ¶ 74.

Third, Plaintiffs allege that the Prospectus was false and misleading because it "misrepresented and omitted to disclose that by no later than the fourth quarter

---

[2] The court takes judicial notice of this document.  See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994) (citation omitted) (on Rule 12(b)(6) motion to dismiss, court may consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading"), overruled on other grounds by Galbraith v. County of Santa Clara, 307 F.3d 1119 (9th Cir. 2002).

1   of 2000, DDi's quick-turn and value-added business had suffered precipitous

2   declines and DDi's transaction pipeline had dried up." Id. ¶ 75.  While the

3   Prospectus stated that DDi encountered "strong" demand in the fourth quarter of

4   2000, that DDi's end-markets were "fast-growing," and that DDi was anticipating

5   "near-term increases in customer demand," Plaintiffs allege that in reality, "the

6   overall demand for quick-turn and value-added PCBs [had] dropped off

7   precipitously," "customers [had been] sen[ding] value-added business overseas,"

8   "[m]any of the customers . . . [had] tried to cancel [orders]," "many of DDi's

9   customers [had] stopped doing business with [DDi]," "DDi's sales pipeline [had]

10  dried up," and "DDi was forced to implement across the board employee pay

11  cuts." Id. ¶¶ 56, 64, 65, 69, 77.

12        Fourth, Plaintiffs allege that the Prospectus "misrepresented and omitted to

13  disclose that in 2000, DDi's revenues were as dependent on the high-premiums

14  [that] DDi [was] reap[ing] from its value-added services . . . as . . . [they were on]

15  its quick-turn business, and that by late-2000 DDi was not receiving high-

16  premiums on its value-added services." Id. ¶ 76.  According to Plaintiffs,

17  "[b]efore 2000, DDi was focused primarily on quick-turn prototyping because the

18  quick-turn work commanded large premiums due to the fast turn-around times,

19  whereas higher volume value-added services yielded lower profit margins." Id.

20  ¶ 53. However, "[s]tarting in 1999, . . . the overall demand for PCBs grew and

21  industry capacity could not keep up." Id. ¶ 54. Consequently, "DDi customers

22  increased their demand for volume orders of PCBs, paying quick-turn pricing for .

23  . . value-added services." Id.  As a result, "DDi turned its focus to and realized at

24  least 50% of its revenues from its value-added services business." Id.  Plaintiffs

25  allege that "[t]he public was unaware of this change," id. ¶ 55, and that the

26  Prospectus failed to reveal both that it had occurred and "that by late-2000 DDi

27  was no[] [longer] receiving high-premiums on its value-added services." Id. ¶ 76.

28

4

1    Fifth, Plaintiffs allege that the Prospectus was misleading in that it asserted

2 that DDi was intending to increase its manufacturing capacity. Id. ¶ 77.  While the

3 Prospectus provided that DDi "ha[d] plans to expand both of [its] manufacturing

4 facilities in California, as well as those in Texas and the United Kingdom,"

5 Plaintiffs allege that these statements were "misleading and incomplete as DDi

6 experienced significant layoffs and actually reduced operations in early 2001."

7 Prospectus at 3, 5; SAC ¶¶ 70, 77.[3]

8    Sixth, Plaintiffs allege that the Prospectus's "outlook" was false and

9 misleading.  SAC ¶ 78.  The Prospectus provided:

> Outlook.  We announced on January 25, 2001 that, while
> acknowledging recent macro-economic indicators suggesting an
> economic slowdown, we remain comfortable with our performance
> estimates for 2001.  Unlike many volume printed circuit board
> manufacturers, we specialize in providing prototype and low-quantity
> manufacturing services for research and development programs and
> new product development, with production lead times that can be as
> short as 24 hours.  We believe this focus provides higher margins and
> lower performance volatility by insulating us from large order
> cancellation or deferment decisions made in light of softening market
> forecasts.  We believe that our large and diverse customer base also
> makes us less vulnerable to individual customer shifts in demand.
> We announced that for 2001 we are targeting increases in net sales

_____

22    [3] Plaintiffs also allege that the Prospectus "stated that [DDi] had sufficient
business to maximize its burgeoning facility space." SAC ¶ 70.  However, the identified
23 portion of the Prospectus does not make this assertion.  See Prospectus at 54
24 ("Accomplishing [our] operations in time-critical situations, as we do, required the
attention of highly-qualified personnel.  Furthermore, our manufacturing systems are
25 managed to maximize flexibility to accommodate widely varying projects for different
26 customers with minimal or no turnover time.  We seek to maximize the use of our
production and manufacturing capacity through the efficient management of time-critical
27 production schedules.  We conduct our operations in several buildings that we own or
28 lease.  We believe our facilities are currently adequate for our operating needs.").

and earnings per share in excess of 25% over our 2000 results.  A number of factors, including those described below in "Risk Factors," will affect our ability to achieve these goals, and there can be no assurance that we will do so.

Prospectus at 4.[4]  Plaintiffs allege that this "glowing outlook was untenable and

---

[4] The Prospectus contained the following "Risk Factors":

- This offering involves a high degree of risk. . . .  If any of the following risks . . . actually occur, our business, financial condition and operating results would likely suffer.  In that event, the market price of our stock could decline, and you could lose all or part of the money you paid to buy our common stock.

- A downturn in the communications or networking equipment industries would likely negatively impact our revenues.

- A majority of our customers are in the communications and networking equipment industries, which are characterized by intense competition, relatively short product life-cycles and significant fluctuations in product demand.  In addition, these industries are generally subject to rapid technological change and product obsolescence.  Furthermore, these industries are subject to economic cycles and have in the past experienced, and are likely in the future to experience, recessionary periods.  A recession or any other event leading to excess capacity or a downturn in the communications or networking equipment industries would likely negatively impact our revenues.

- Our operating results have fluctuated in the past because we sell on a purchase-order basis rather than pursuant to long-term contracts.  We are therefore sensitive to variability in demand by our customers. . . .  Because of these factors, you should not rely on quarter-to-quarter comparisons of our results of operations as an indication of our future performance.

- Because we depend on a core group of significant customers, our

(continued . . .)

6

1  incomplete as DDi had suffered a precipitous loss of both value-added and quick-

2  turn business leading up to the . . . Offering such that DDi's sales pipeline was

3  depleted entering 2001." SAC ¶ 78.

4        Plaintiffs assert that these various false and misleading statements and

5  omissions caused the "Offering of common stock and convertible notes [to be]

6  completed at artificially inflated prices." Id. ¶ 11. In fact, "[o]nce DDi's [true]

7  financial condition became apparent, the Company's stock price fell below $1.00

8  per share." Id. ¶ 12. On August 20, 2003, DDi announced that it had filed for

9  reorganization under Chapter 11 of the United States Bankruptcy Code. Id. ¶ 4.

10        On October 1, 2003, the first complaint related to this action was filed.

11  After various other complaints were filed, the court consolidated the actions and

12  appointed Paul Poppe ("Poppe"), LeRoy Schneider ("Schneider"), and Rand

13  Skolmick ("Skolmick") as lead plaintiffs. On July 26, 2004, lead plaintiffs Poppe,

14  Schneider, and Skolmick, along with representative plaintiff Municipal

15  Employees' Retirement System of Louisiana ("MERSL"), filed a Consolidated

16  Amended Complaint ("CAC") on behalf of those who purchased DDi common

17  stock between December 19, 2000 and April 29, 2003, including those who

18  acquired DDi common stock in the Offering.[5] The CAC asserted that the above-

19  mentioned false and misleading statements and omissions in the Prospectus, as

20

21  ─────────────

              results of operations may be negatively impacted if key customers
22            discontinue the use of our services.

23
       •      As a result of our level of debt and the terms of our debt instruments
24            . . . our vulnerability to adverse general economic conditions is
              heightened.
25

26  Prospectus at 9-14.

27        [5] The CAC did not assert claims on behalf of those who purchased the Convertible

28  Notes.

7

well as a series of other allegedly false and misleading statements issued by DDi between December 19, 2000 and April 29, 2002, were part of a carefully-crafted, fraudulent scheme to mislead investors. The CAC advanced causes of action under: (1) section 11 of the Securities Act of 1933 ("Securities Act"), (2) section 12(a)(2) of the Securities Act, (3) section 15(a) of the Securities Act, (4) section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and (5) section 20(a) of the Exchange Act.

On January 7, 2005, the court issued an order dismissing the CAC. See In re DDi Corp. Sec. Litig. ("In re DDi"), 2005 U.S. Dist. LEXIS 1056 (C.D. Cal. Jan. 7, 2005). The court found that although Fed. R. Civ. P. 8(a)'s notice pleading model generally applied to Securities Act claims and Fed. R. Civ. P. 9(b)'s heightened pleading model applied to Exchange Act claims, Plaintiffs' entire CAC was "grounded in fraud," and, therefore, subject to the heightened pleading requirements imposed by Rule 9(b). Id. at *57-61.[6] The court then found that the CAC failed to satisfy Rule 9(b) because it did not particularly allege that any of Defendants' statements were materially false and misleading. Id. at *62-79.

On February 22, 2005, lead plaintiffs Poppe and Schneider, along with a new representative plaintiff, Robert Watson ("Watson"), filed the instant SAC.[7] The SAC, unlike the CAC, focuses solely on the Prospectus and asserts only Securities Act claims. Additionally, Plaintiffs now purport to assert claims on behalf of those who purchased DDi common stock pursuant to or traceable to the Prospectus, as well as on behalf of those who purchased the Convertible Notes. See SAC ¶ 42. Finally, the SAC, unlike the CAC, asserts that the alleged

---

[6] Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

[7] Despite Defendants' arguments to the contrary, the SAC does not assert any claims based upon allegations previously dismissed with prejudice.

misrepresentations and omissions in the Prospectus were the result of negligence, not fraud. See, e.g., id. ¶ 41 ("Each of the defendants owed to the purchasers of DDi stock and the Convertible Notes . . . the duty to make a reasonable and diligent investigation of the statements contained in the . . . Prospectus . . . . This duty included performing an appropriate investigation to ensure that the statements contained therein were true, and that there were no omissions of material fact required to be stated in order to make the statements contained in the . . . Prospectus not misleading. . . . [E]ach of the defendants violated these specific duties and obligations."). See also id. ¶¶ 95-96, 113.

In the SAC, Plaintiffs assert claims under the Securities Act against three groups of defendants. First, they sue the following Individual Defendants: Charles Dimick, Chairman of the Board of Directors of DDi ("Dimick"); Bruce D. McMaster, President and Chief Executive Officer of DDi ("McMaster"); Joseph P. Gisch, Vice President and Chief Financial Officer of DDi ("Gisch"); Gregory Halvorson, Vice President of Operations of DDi ("Halvorson"); John Peters, Vice President of Sales and Marketing of DDi ("Peters"); and Mark R. Benham, a director of DDi from November 1998 to December 31, 2002 ("Benham") (collectively, the "Individual Defendants"). Second, Plaintiffs name: Bain Capital, Inc., a shareholder of DDi ("Bain"); David Dominik, a director of DDi from November 1998 to December 31, 2002 and a managing director of Bain from 1990 until March 2000 ("Dominik"); Stephen G. Pagliuca, a director of DDi and a managing director of Bain ("Pagliuca"); Stephen M. Zide, a director of DDi and a principal at Bain ("Zide"); and Edward W. Conrad, a director of DDi and a principal at Bain ("Conrad") (collectively, the "Bain Defendants"). Third, Plaintiffs name the following defendants for their role as underwriters in the Offering: Credit Suisse First Boston Corporation ("CSFB"); FleetBoston Financial Corporation ("Fleet"), the successor-in-interest to Robertson Stephens, Inc. ("Robertson"); J.P. Morgan Securities, Inc. ("JP Morgan"); and Needham &

1   Company, Inc. ("Needham") (collectively, the "Underwriter Defendants"). Id.

2   ¶¶ 36-39.[8] DDi is not named as a defendant because it has filed a petition for

3   reorganization under Chapter 11 of the United States Bankruptcy Code. Id. ¶ 21.

4   The SAC asserts claims under sections 11, 12(a)(2), and 15(a) of the Securities

5   Act.

6        On March 25, 2005, each of the three groups of defendants filed separate

7   motions to dismiss the SAC pursuant to Rule 9(b) and Rule 12(b)(6) of the Federal

8   Rules of Civil Procedure.  On April 25, 2005, Plaintiffs filed one opposition to

9   these three motions.  On May 6, 2005, the Individual Defendants filed a

10  supplemental brief in further support of their motion to dismiss.  On May 20,

11  2005, Plaintiffs filed an opposition to the Individual Defendants' supplemental

12  brief.

13

14                    **III.  LEGAL STANDARD**

15       A court should dismiss a complaint under Rule 12(b)(6) of the Federal

16  Rules of Civil Procedure for failure to state a claim only where it appears beyond

17  doubt that plaintiff can prove no set of facts in support of the claim which would

18  entitle the plaintiff to relief.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  All

19

20  ─────────────────────

21       [8] The Underwriter Defendants were the four lead underwriters in the Offering.
    SAC ¶¶ 36-39.  Plaintiffs allege that CSFB sold and distributed 2,700,000 shares of DDi

22  common stock and $100 million worth of Convertible Notes in the Offering; that
    Robertson sold and distributed 1,462,500 shares of DDi common stock and $100 million

23  worth of Convertible Notes; that JP Morgan sold and distributed 1,462,500 shares of DDi

24  common stock and $100 million worth of Convertible Notes; and that Needham sold and
    distributed 375,000 shares of DDi common stock. Id.

25       Through the Underwriter Defendants, DDi sold 3 million shares, Bain sold

26  2,296,503 shares, McMaster sold 82,500 shares, Dimick sold 82,500 shares, Gisch sold
    22,500 shares, Halvorson sold 22,500 shares, and Peters sold 45,000 shares. Id. ¶¶ 22-26,

27  28, 60-61.  McMaster, Dimick, Gisch, Dominik, Pagliuca, Zide, Conrad, and Benham

28  signed the Prospectus. Id. ¶¶ 22-24, 30-34, 60.

                               10

allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. <u>Smith v. Jackson</u>, 84 F.3d 1213, 1217 (9th Cir. 1996).

Review is generally limited to the contents of the complaint. <u>Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.</u>, 69 F.3d 381, 385 (9th Cir. 1995). However, material that is properly presented to the court as part of the complaint may be considered as part of a motion to dismiss. <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688-89 (9th Cir. 2001). If a plaintiff fails to attach to the complaint the documents on which it is based, the defendant may attach those documents to a Rule 12(b)(6) motion to show that they do not support the plaintiff's claim. <u>Id.</u> In addition, the court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned. <u>See</u> Fed. R. Evid. 201.

## IV. ANALYSIS

Defendants attack Plaintiffs' three Securities Act claims collectively and individually. First, Defendants argue that Plaintiffs cannot assert any Securities Act claims on behalf of those who purchased the Convertible Notes because: (1) Plaintiffs lack standing to do so, and (2) such claims are time-barred. Second, Defendants contend that the SAC must be dismissed because it, like the CAC, fails to satisfy Rule 9(b)'s heightened pleading requirements for averments of fraud. Third, Defendants argue that Plaintiffs' § 11 claim must be dismissed because: (1) Plaintiffs have failed to allege the material falsity or misleading nature of any statement in the Prospectus, (2) the "negative causation" defense bars Plaintiffs' claim(s), and (3) the allegedly false and misleading statements in the Prospectus are rendered inactionable by the puffery doctrine, the bespeaks caution doctrine, and/or the safe harbor provision of the Private Securities Litigation Reform Act ("PSLRA"). Fourth, with respect to Plaintiffs' § 12(a)(2) claim, Defendants

11

1   argue: (1) that the entire claim must be dismissed because the Prospectus was not

2   materially false and misleading, (2) that the claim must be dismissed insofar as it

3   is asserted on behalf of those who purchased DDi common stock "traceable to" the

4   Prospectus, (3) that the claim must be dismissed insofar as it is asserted against the

5   Individual Defendants and Bain because they were not statutory "offerors" or

6   "sellers" under § 12(a)(2), and (4) that the claim must be dismissed insofar as it is

7   asserted against the Underwriter Defendants because Plaintiffs have failed to

8   allege which particular underwriter sold them DDi common stock.  Fifth,

9   Defendants argue that Plaintiffs' § 15(a) claim must be dismissed insofar as it is

10  asserted against Bain because Plaintiffs have failed to allege that Bain was a

11  "controlling person."

12        **A. <u>Claims Asserted on Behalf of Convertible Note Purchasers</u>**

13        In the SAC, unlike in the CAC, Plaintiffs assert claims on behalf of those

14  who purchased Convertible Notes.  Defendants argue that Plaintiffs cannot assert

15  these claims because: (1) they do not have standing to do so, and (2) the claims are

16  barred by the statute of limitations.

17                    1. <u>Standing</u>

18        The named plaintiffs purchased DDi common stock; they do not claim to

19  have purchased Convertible Notes.  <u>See</u> SAC ¶¶ 19-20.  Consequently, Defendants

20  argue that Plaintiffs lack standing to assert claims on behalf of those who did

21  purchase Convertible Notes.

22        In <u>In re MobileMedia Sec. Litig.</u>, 28 F. Supp. 2d 901 (D.N.J. 1998), the

23  District Court of New Jersey encountered a similar situation.  There, the court

24  stated:

25        Defendants challenge[] the standing of stock purchasers to bring
26        [Securities Act] claims on behalf of the purchasers of . . . Notes. . . .
27        "That a suit may be a class action adds nothing to the question of
           standing, for even named plaintiffs who represent a class must allege
28

and show that they personally have been injured." <u>Lewis v. Casey</u>, 518 U.S. 343, 357 (1996). In the instant matter, Plaintiffs have alleged an injury traceable to the Secondary Offering – the same offering in which the Notes were issued. Courts have allowed those with valid securities claims to represent the interests of the purchasers of other types of securities in class action suits. Given Plaintiffs have sufficiently alleged individual cognizable injuries pursuant to [the Securities Act], Plaintiffs have standing to bring these claims [on behalf of those who purchased the notes]. Concerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification.

<u>Id.</u> at 911 n. 7 (selected citations omitted).

The court agrees with this analysis. Here, lead plaintiffs, Poppe and Schneider, and representative plaintiff, Watson, allege to have purchased DDi common stock from the Offering. Like the plaintiffs in <u>In re MobileMedia</u>, Plaintiffs assert claims not only on behalf of those who purchased stock from this offering, but also on behalf of those who purchased notes traceable to the Offering. "Given Plaintiffs have sufficiently alleged individual cognizable injuries pursuant to [the Securities Act], Plaintiffs have standing to bring these claims." <u>Id.</u> Accordingly, the court denies Defendants' motions insofar as they assert that Plaintiffs lack standing to assert claims on behalf of those who purchased Convertible Notes.

### 2. Statute of Limitations

Defendants argue that the statute of limitations bars Plaintiffs' claims asserted on behalf of those who purchased the Convertible Notes. The statute of limitations for Securities Act claims is set forth in § 13, which provides that "[i]n no event shall any . . . action be brought to enforce a liability created under [section 11 or section 12(a)(1)] more than three years after the security was bona fide offered to the public, or under [section 12(a)(2)] more than three years after the sale." 15 U.S.C. § 77m.

13

Here, Plaintiffs did not raise claims on behalf of the Convertible Note purchasers until February 22, 2005, when they filed the SAC.  This was far more than 3 years after the February 2001 Offering.  Consequently, absent some exception, Plaintiffs' claims are time-barred insofar as they are asserted on behalf of the Convertible Note purchasers.

Recognizing this fact, Plaintiffs argue that the Convertible Note purchasers' claims "relate back" under Rule 15(c) of the Federal Rules of Civil Procedure to the date that the "initial complaint" was filed in this action.  <u>See</u> Opp. at 36.  Rule 15(c) provides:

> An amendment of a pleading relates back to the date of the original pleading when . . . (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed. R. Civ. P. 15(c).

"The Advisory Committee Note to the 1966 Amendment to Rule 15(c) observes that '[t]he relation back of amendments changing *plaintiffs* is not expressly treated in revised Rule 15(c) since the problem is generally easier' and goes on to comment that 'the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs.'" <u>Immigrant Assistance Project of the Los Angeles County Fed'n of Labor v. Immigration and Naturalization Serv.</u>, 306 F.3d 842, 857 (9th Cir. 2002) (emphasis added) (quoting

1  Fed. R. Civ. P. 15(c) advisory committee's note). "In the Ninth Circuit, [a]n

2  amendment adding a party plaintiff relates back to the date of the original pleading

3  only when: 1) the original complaint gave the defendant adequate notice of the

4  claims of the newly proposed plaintiff; 2) the relation back does not unfairly

5  prejudice the defendant; and 3) there is an identity of interests between the original

6  and newly proposed plaintiff." Id. (citing Rosenbaum v. Syntex Corp., 95 F.3d

7  922, 935 (9th Cir. 1996)).

8         The previous complaints filed in this action did not give Defendants

9  "adequate notice of the claims" of the Convertible Note purchasers. Instead, the

10  prior complaints focused solely on the claims of those who purchased DDi

11  common stock. See, e.g., CAC ¶ 1 ("[Plaintiffs] bring this action on their own

12  behalf and on behalf of all persons or entities who purchased DDi Corp. common

13  stock between December 19, 2000 and April 29, 2002 including all persons who

14  acquired DDi common stock pursuant to, or traceable to, its February 14, 2001

15  offering."). Cf. Rembold v. Pacific First Fed. Sav. Bank, 1989 U.S. Dist. LEXIS

16  3953, at *4 (D. Or. Apr. 7, 1989) ("The fact that the . . . plaintiffs instituted

17  litigation concerning the stock transaction of [the defendant] does not put the

18  defendants on notice as to every other person who purchased the stock."). This

19  has remained true throughout this litigation despite the fact that Plaintiffs must

20  have known that the Convertible Notes were issued along with the common stock

21  in the Offering. See Prospectus at Title Page ("Concurrently with this offering, we

22  are offering $100,000,000 aggregate principal amount of 5 1/4% convertible

23  subordinated notes due 2008.").

24         Furthermore, there is a lack of an "identity of interest" between the "original

25  plaintiffs" – i.e., those who purchased DDi common stock pursuant to or traceable

26  to the Prospectus – and the "newly proposed plaintiffs" – i.e., those who purchased

27  Convertible Notes. In fact, these two groups purchased entirely different

28  securities. Cf. Rosenbaum, 95 F.3d at 935 (no identity-of-interest in securities

15

1  fraud class action where "newly proposed class members bought stock at different

2  values and after different disclosures and statements"). For both of these reasons,

3  the Convertible Note purchasers' claims do not "relate back" to the previous

4  complaints' filing dates. Accordingly, the statute of limitations bars Plaintiffs'

5  Securities Act claims insofar as they are asserted on behalf of those who

6  purchased the Convertible Notes.[9]

7  ## B. **Applicable Pleading Standard**

8      In ruling on the CAC, the court found that all of Plaintiffs' claims, including

9  their Securities Act claims, were "grounded in fraud," and were therefore subject

10 to Rule 9(b)'s heightened pleading requirements for "averments of fraud." See In

11 re DDi, 2005 U.S. Dist. LEXIS 1056, at *57-62. Analyzing Plaintiffs' allegations

12 under Rule 9(b)'s heightened pleading standard, the court concluded that Plaintiffs

13 had failed to particularly allege that any statement in the Prospectus was materially

14 false and misleading. See id. at 62-75.

15     In the SAC, Plaintiffs have omitted all references to fraud and no longer

16 assert fraud-based Exchange Act claims. Furthermore, they now contend that

17

---

18    [9] Almost all of the cases cited by Plaintiffs in support of their "relation back"
   argument are inapplicable to the present case due to the fact that they discuss whether

19 new claims, not new claims by new plaintiffs, "relate back." See Martell v. Trilogy Ltd.,
   872 F.2d 322 (9th Cir. 1989); E.W. French & Sons, Inc. v. Gen. Portland Inc., 885 F.2d

20 1392, 1395-96 (9th Cir. 1989); Percy v. San Francisco Gen. Hosp., 841 F.2d 975, 978

21 (9th Cir. 1988); Grattan v. Burnett, 710 F.2d 160, 163 (4th Cir. 1983); Santana v. Holiday
   Inns, Inc., 686 F.2d 736, 738-40 (9th Cir. 1982); In re Digital Microwave Corp. Sec.

22 Litig., 1992 U.S. Dist. LEXIS 18469, at *5-6 (N.D. Cal. Oct. 19, 1992). Plaintiffs also

23 inappropriately cite an unpublished Ninth Circuit decision. See Viall v. Scott, 1991 U.S.
   App. LEXIS 22051 (9th Cir. 1991) ("This disposition is not appropriate for publication

24 and may not be cited to or by the courts of this circuit except as provided by the 9th Cir.

25 R. 36-3."). Finally, Plaintiffs cite In re Network Assoc., Inc. II Sec. Litig., 2003 U.S.

26 Dist. LEXIS 14442, at *24-25 (N.D. Cal. Mar. 25, 2003), which is inapplicable to the
   present case due to the fact that the plaintiffs in that case added claims on behalf of new

27 plaintiffs who had purchased the same security as the original plaintiffs, rather than – as is

28 the case here – on behalf of new plaintiffs who purchased an entirely different security.

1  Defendants' alleged wrongful conduct was the result of negligence, not fraud.

2  Consequently, they argue that the SAC is not "grounded in fraud," is not subject to

3  Rule 9(b), and is instead subject only to Rule 8(a)'s notice pleading model.

4  Defendants disagree, arguing that Rule 9(b) continues to apply because:

5  (1) Plaintiffs are bound to the fraud-based allegations in the CAC, and (2) the SAC

6  independently "sounds in fraud." Because the SAC contains no more detail than

7  the CAC, Defendants conclude that the SAC must be dismissed for failure to

8  satisfy Rule 9(b).

9                  1.   Effect of Fraud-Based Allegations in the CAC

10        Defendants' first argument is that Rule 9(b) continues to apply to Plaintiffs'

11  claims because Plaintiffs are bound by the fraud-based allegations in the CAC. In

12  particular, Defendants argue that Plaintiffs cannot now claim that conduct once

13  alleged to be "fraudulent" was actually "negligent." According to Defendants,

14  these allegations are contradictory, and Plaintiffs are bound to their former fraud-

15  based claims, which are subject to – and fail to meet – Rule 9(b)'s heightened

16  pleading standard.

17        This argument fails. Although a plaintiff generally cannot amend a

18  complaint to assert facts contradicting those alleged in an earlier complaint, see,

19  e.g., Reddy v. Litton Indus., Inc., 912 F.2d 291, 296-97 (9th Cir. 1990),

20  Defendants cite no authority for the proposition that a plaintiff cannot amend a

21  complaint to assert that conduct once alleged to be intentional or fraudulent was

22  actually negligent. Indeed, the conduct at issue here – the inclusion of false and

23  misleading statements in a prospectus – could just as easily result from negligence

24  as from fraud. Therefore, Plaintiffs were entitled to change the theory of their case

25  to one of negligence, and the SAC has now superseded the CAC and is the

26  operative complaint. See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,

27  896 F.2d 1542, 1546 (9th Cir. 1990) ("an amended pleading supersedes the

28  original"). See also Kelley v. Crosfield Catalysts, 135 F.3d 1202, 1204 (7th Cir.

1998) ("It is well-established that an amended pleading supersedes the original pleading; facts not incorporated into the amended pleading are considered *functus officio*."); Loux v. Rhay, 375 F.2d 55, 57 (9th Cir. 1967) (same); Lubin v. Chicago Title & Trust Co., 260 F.2d 411, 413 (7th Cir. 1958) (same); 3 James Wm. Moore et al., Moore's Federal Practice ¶ 15.17[3] (3d ed. 1997) (same).  Consequently, Defendants' arguments regarding the proper pleading standard must be based on the allegations in the SAC, not those found in the CAC.  See Bullen v. Bretteville, 239 F.2d 824, 833 (9th Cir. 1956) ("Once amended, the [former complaint] no longer performs any function as a pleading and cannot be utilized to aid a defective amendment.") (citations omitted).  Accordingly, the court rejects Defendants' argument that Rule 9(b) applies to the SAC because of the CAC's allegations.

### 2.  Allegations in the SAC

Defendants' second argument is that Plaintiffs' Securities Act claims as alleged in the SAC independently "sound in fraud" and are therefore subject to Rule 9(b).  This argument also fails.

In In re Daou Sys., Inc., Sec. Litig. ("In re Daou"), 397 F.3d 704 (9th Cir. 2005), the Ninth Circuit recently clarified when Securities Act claims (or certain portions thereof) are subject to Rule 9(b)'s heightened pleading requirements:

> Although [the applicable portions of the Securities Act] do[] not contain an element of fraud, a plaintiff may nonetheless be subject to Rule 9(b)'s particularity mandate if his complaint "sounds in fraud": "[T]he plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of a claim.  In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)."  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103-04 (9th Cir. 2003).

> In a case where fraud is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a). As the Fifth Circuit [has written]: "Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated. The proper route is to disregard averments of fraud not meeting Rule 9(b)'s standard and then ask whether a claim has been stated." . . . [T]he Eighth Circuit [has] elaborated: "The only consequence of a holding that Rule 9(b) is violated with respect to a [Securities Act] claim would be that any allegations of fraud would be stripped from the claim. The allegations of innocent or negligent misrepresentation, which are at the heart of a [Securities Act] claim, would survive." Thus, if particular averments of fraud are insufficiently pled under Rule 9(b), a district court should "disregard" those averments or "strip" them from the claim. The court should then examine the allegations that remain to determine whether they state a claim.
>
> A district court need not rewrite a deficient complaint however. Rule 9(b) may prove fatal to . . . Securities Act claims "grounded in fraud" when the complaint makes a "wholesale adoption" of the securities fraud allegations for purposes of the Securities Act claims. In such cases, a district court is not required to sift through allegations of fraud in search of some "lesser included" claim of strict liability. It may dismiss. If it does so, it should ordinarily accept a proffered amendment that either pleads with the requisite particularity or drops the defective allegations and still states a claim.

In re Daou, 397 F.3d at 723 (selected citations and quotation marks omitted).

The SAC does not allege "a unified course of fraudulent conduct" implicating Rule 9(b). Instead, it is rooted in allegations of negligence. See, e.g., SAC ¶¶ 41, 44(c), 95-96, 106, 113. Such allegations clearly do not "sound in fraud." See Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) ("[S]everal circuits have distinguished between allegations of fraud and allegations of

negligence, applying Rule 9(b) only to claims pleaded under Section 11 and Section 12(a)(2) that sound in fraud."); In re Dynegy, Inc. Sec. Litig., 339 F. Supp. 2d 804, 827 (S.D. Tex. 2004) ("When § 11 claims are grounded in negligence and not in fraud there is no scienter requirement, and the plaintiff need only satisfy the liberal pleading requirements of Rule 8(a)."). Compare Rombach, 355 F.3d at 178 ("[Plaintiffs'] claims are not subject to the heightened pleading requirements of Rule 9(b), because they sound in negligence: 'each of the Underwriter Defendants owed to the purchasers of the shares of [the company] . . . the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus"), Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir. 1997) ("the [Securities Act] claim . . . is not premised on fraud . . . [because] the Complaint[] alleges that defendants failed to make a 'reasonable investigation' of the statements contained in the Registration Statements and Prospectuses") (emphasis omitted), and In re Calpine Corp. Sec. Litig., 288 F. Supp. 2d 1054, 1078 (N.D. Cal. 2003) (following allegation sounds in negligence: "None of the defendants . . . made a reasonable investigation or possessed reasonable grounds for the belief that the challenged statements . . . were accurate and complete in all material respects."), with SAC ¶ 41 ("Each of the defendants owed to the purchasers of DDi stock and the Convertible Notes . . . the duty to make a reasonable and diligent investigation of the statements contained in the . . . Prospectus . . . ."). Consequently, Rule 9(b) does not apply to the entire SAC.[10]

---

[10] Defendants attempt to avoid this result by citing a series of cases holding that a complaint may still be "grounded in fraud," and therefore subject to Rule 9(b), despite the fact that it disclaims reliance on fraud. The court concurs with the proposition, but finds the facts of these cases inapposite. See, e.g., Castlerock Management, LTD v. Ultralife Batteries, Inc., 68 F. Supp. 2d 480, 486 (D.N.J. 1999) (complaint alleging that defendants "participated in the alleged wrongdoing, in part, in order to continue and prolong the illusion of [the company's] financial growth, to inflate [the company's] publicly reported
(continued . . .)

Furthermore, the SAC does not contain any particular "averments of fraud" triggering Rule 9(b). Instead, each and every allegation in the SAC is rooted in the assertion that the Prospectus was false and misleading as a result of Defendants' negligence.[11] Consequently, Rule 9(b) does not apply to any of the SAC's allegations. Accordingly, Plaintiffs' Securities Act claims are subject to Rule 8(a)'s notice pleading model, not Rule 9(b). All of Defendants' arguments premised upon Rule 9(b) are therefore rejected.

---

revenues and earnings, to conceal the adverse facts concerning [the company's] operations, financial condition and business and to permit [the company] to raise millions of dollars pursuant to the Offering"); In re Anchor Gaming Sec. Litig., 33 F. Supp. 2d 889, 892-93 (D. Ariz. 1999) (complaint alleging that "certain . . . [d]efendants decided to take advantage of the rising price of . . . common stock," that while "the price of stock dropped significantly following [an] announcement, defendants acted quickly to stem this decline," that a particular announcement "had the desired effect" of driving up the price of the company's stock, and that defendants decided to sell a substantial portion of their equity in the company while certain facts were "still concealed"); In re GameTech Int'l, Inc. Sec. Litig., 1999 U.S. Dist. LEXIS 22289, at *13 (D. Ariz. June 1, 1999) (relying, in part, on allegation that defendants "failed to [meet their duty to refrain from misleading investors] by concealing then-existing adverse facts affecting [the company's] business and prospects"); In re Computervision Corp. Sec. Litig., 869 F. Supp. 56, 63-64 (D. Mass. 1994) (complaint alleging, among other things, that "in order to give the offerings a coloration of legitimacy and arm's-length pricing and to prop up the immediate aftermarket prices, Shearson manipulated the market for Computervision securities with secret promises and inducements to customers to participate in the Offerings").

[11] Defendants repeatedly argue that the SAC contains "averments of fraud" because it alleges: (1) that Defendants knowingly failed to disclose that DDi had been sluggish beginning in the fourth quarter of 2000; and (2) that Defendants had engaged in "accounting improprieties" to "mask" – i.e., deliberately conceal – DDi's deteriorating financial condition. First, the SAC nowhere alleges that Defendants "knowingly" failed to disclose DDi's financial condition. Second, the SAC alleges that certain accounting improprieties "masked" – i.e., hid from public view – DDi's financial condition, not that Defendants committed the accounting improprieties or that they did so intentionally to conceal DDi's financial condition. See SAC ¶¶ 86, 89.

## C. Section 11 Claim

Plaintiffs assert a claim under § 11(a) of the Securities Act against the Underwriter Defendants and those defendants who signed the Prospectus (i.e., Dimick, McMaster, Gisch, Benham, Dominik, Pagliuca, Zide, and Conrad). Plaintiffs' claim is rooted in the allegation that the Prospectus was materially false and misleading for the six reasons outlined above. See supra Part II.[12]

---

[12] As mentioned, Plaintiffs allege that the Prospectus was materially false and misleading on the following grounds:

[1] DDi's purportedly exceptional full year and fourth quarter 2000 financial results [included in the Prospectus] were materially false and misleading as they included revenue to which DDi was not entitled under GAAP or DDi's internal accounting policy.

[2] [T]he February Prospectus misrepresented the amount of DDi customers and failed to disclose that DDi had lost many of its historically largest customers. Specifically, even if DDi included its smallest customers (under $10K per year), its total customer base was approximately 500, not 2000. As for specific clients, by the fourth quarter 2000, DDi was booking very little or no business from, inter alia, Alcatel, Redback, Intel, Marconi, 3Com, IBM, Nortel, and Cisco.

[3] [T]he February Prospectus misrepresented and omitted to disclose that by no later than the fourth quarter of 2000, DDi's quick-turn and value-added businesses had suffered precipitous declines and DDi's transaction pipeline had dried up.

[4] [T]he February Prospectus misrepresented and omitted to disclose that in 2000, DDi's revenues were as dependent on the high-premiums DDi reaped from its value-added services business as those from its quick-turn business, and that by late-2000 DDi was not receiving high-premiums on its value-added services.

[5] [T]he statements concerning DDi's intent to increase and maximize its manufacturing capacity [were] misleading and incomplete as DDi

(continued . . .)

22

Section 11 establishes liability for false and misleading statements made in a registration statement.  See 15 U.S.C. § 77k.  It provides as follows:

> In case any part of the registration statement . . . contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security . . . may . . . sue –
>
> (1) every person who signed the registration statement;
>
> (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;
>
> (3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner; . . . [and]
>
> (5) every underwriter with respect to such security.

Id.  To assert a claim under § 11, the plaintiff must allege: "(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." In re Daou, 397 F.3d at 722-23.  "No

---

experienced significant layoffs and actually reduced operations in early 2001.

[6] DDi's glowing outlook was untenable and incomplete as DDi had suffered a precipitous loss of both value-added and quick-turn business leading up to the February Offering such that DDi's sales pipeline was depleted entering 2001.

SAC ¶¶ 73-79.

1  scienter is required for liability under § 11; defendants will be liable for innocent
2  or negligent material misstatements or omissions." Id. at 723.

3      An omission is considered "material" if there is "a substantial likelihood
4  that, under all the circumstances, the omitted fact would have assumed actual
5  significance in the deliberations of a reasonable shareholder." In re McKesson
6  HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000). "Put
7  another way, there must be a substantial likelihood that the disclosure of the
8  omitted fact . . . would have been viewed by the reasonable investor as having
9  significantly altered the 'total mix' of information made available." Id. (citing
10 TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). See also In re Stac
11 Elec. Sec. Litig. ("In re Stac"), 89 F.3d 1399, 1408 (9th Cir. 1996) (same). A
12 misrepresentation is material when an investor would attach importance to it in
13 making an investment decision. See Basic, Inc. v. Levinson, 485 U.S. 224, 231
14 (1988). "Although a court may dismiss a claim on the ground that a misstatement
15 or omission was not material, the standard for doing so is high." In re Sterling
16 Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d 216, 262 (E.D.N.Y. 2002)
17 (quotation marks omitted). In fact, "a complaint may not properly be dismissed
18 pursuant to Rule 12(b)(6) . . . on the ground that the alleged misstatements or
19 omissions are not material unless they are so obviously unimportant to a
20 reasonable investor that reasonable minds could not differ on the question of their
21 importance." Id. at 262-63 (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d
22 Cir. 1985)). "Moreover, a court deciding a motion to dismiss shall be mindful that
23 the issue of whether a statement or omission is material is usually a question for
24 the fact finder." Id. (citing TSC Indus., Inc., 426 U.S. at 450). See also In re
25 Stac, 89 F.3d at 1405 ("The 'materiality' of an omission is a fact-specific
26 determination that should ordinarily be assessed by a jury. [O]nly if the adequacy
27 of the disclosure or the materiality of the statement is so obvious that reasonable
28 minds could not differ are these issues appropriately resolved as a matter of law.")

1  (citations and quotation marks omitted).  See generally In re Network Assoc., Inc.

2  II Sec. Litig., 2003 U.S. Dist. LEXIS 14442, at *15 (N.D. Cal. Mar. 25, 2003)

3  ("[W]hether a statement or omission is misleading to potential investors requires

4  delicate assessments of the inferences a 'reasonable shareholder' would draw from

5  a given set of facts and the significance of those inferences to him, and these

6  assessments are peculiarly one for the trier of fact.") (citations and quotation

7  marks omitted).

8      Defendants argue that Plaintiffs' § 11 claim must be dismissed because:

9  (1) the Prospectus did not include any material false and misleading statements or

10  omissions, (2) the "negative causation" defense bars Plaintiffs' Securities Act

11  claims, and (3) the allegedly false and misleading statements in the Prospectus are

12  not actionable due to the puffery doctrine, the bespeaks caution doctrine, and/or

13  the PSLRA's safe harbor provision.[13]

14    1. Material False and Misleading Statements and/or Omissions in the Prospectus

15      Despite Defendants' arguments to the contrary, Plaintiffs have adequately

16  alleged that the Prospectus was materially false and misleading with respect to at

17  least three matters.  First, Plaintiffs adequately allege that the financial reports

18  included in the Prospectus were materially false and misleading.  According to

19  Plaintiffs, these financial reports were overstated due to "accounting

20  improprieties," including DDi's tendency to "recognize[] revenue on (1) the

21  premature shipment of orders to clients (e.g., Watkins Johnson, Marconi) prior to

22  the authorized delivery date; and (2) the shipment of orders from one DDi facility

23

24

25      [13] Defendants also argue that Plaintiffs do not have standing to assert the § 11
26  claim.  While lead plaintiffs Poppe and Schneider may lack standing, see Joint Decl. of
    Poppe, Schneider, Skolmick, and Rust ¶ 4 (stating earlier in these proceedings that they
27  do not have standing to assert § 11 claim), there is no dispute that representative plaintiff
28  Watson has standing.

25

to another." SAC ¶ 80.  Plaintiffs allege that these practices violated GAAP and DDi's own internal accounting policies.  Id. ¶ 79.

Defendants contend that Plaintiffs' allegations regarding these accounting improprieties are insufficient because: (1) they fail to meet the particularity requirement of Rule 9(b), and (2) they fail to demonstrate that the Prospectus was "materially" false and misleading.  Defendants' first argument fails because Plaintiffs' allegations are subject to Rule 8(a), not Rule 9(b).  Defendants' second argument fails due to the fact that Plaintiffs expressly allege that these accounting improprieties caused the Prospectus to be "materially" false and misleading, and because Plaintiffs allege that, as an example, these accounting improprieties were responsible for approximately 25% of one of DDi's facility's quarterly revenues.  See id. ¶¶ 80, 89.  Given Rule 8(a)'s extremely liberal pleading standard, see In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 322-24 (S.D.N.Y. 2003), and the fact that a complaint may not be dismissed on materiality grounds unless the misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," see In re Sterling Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d at 262, the court finds that Plaintiffs have sufficiently alleged that the Prospectus was materially false and misleading as a result of these alleged "accounting improprieties."

Second, Plaintiffs have adequately alleged that the Prospectus "misrepresented the amount of DDi customers . . . ."  SAC ¶ 74.  See also id. ¶ 68.  While the Prospectus stated that DDi had "over 2000 customers," Plaintiffs allege that DDi actually had only 500 customers.  Id. ¶¶ 68, 74.  Defendants argue that Plaintiffs' allegations regarding this matter fail to satisfy Rule 9(b).  However, as mentioned, Rule 9(b) is inapplicable.  Defendants also advance certain arguments based upon the allegations found in the CAC.  However, as also mentioned, the SAC has superseded the CAC.  See Bullen, 239 F.2d at 833.  Finally, Defendants

argue that this alleged misstatement regarding the number of DDi customers was immaterial.  However, it is not "obvious" that a "reasonable investor" would find it immaterial that a company touting its "large and diverse customer base" misrepresented the number of its customers by 300%.  See SAC ¶ 67 (quoting Prospectus as stating: "We believe that our large and diverse customer base also makes us less vulnerable to individual customer shifts in demand.").  Therefore, Plaintiffs have sufficiently alleged that the Prospectus made a material misrepresentation with respect to the number of DDi customers.[14]

Third, Plaintiffs have adequately alleged that the Prospectus misrepresented the recent and then-current state of DDi's business affairs.  See id. ¶ 75.  While the Prospectus represented that DDi had experienced "strong demand" in the fourth quarter of 2000 and included various other statements indicating that DDi had been and was doing well, Plaintiffs allege that in reality, DDi's business was hemorrhaging in the fourth quarter of 2000.  Id. ¶¶ 64, 65, 75.  For example, Plaintiffs allege that by the fourth quarter of 2000, "the overall demand for quick-turn and value-added PCBs [had] dropped off precipitously," "[m]any of the customers . . . [had] tried to cancel [orders]," "many of DDi's customers [had] stopped doing business with [DDi]," "DDi's sales pipeline [had] dried up," and "DDi was forced to implement across the board employee pay cuts."  See id. ¶¶ 56, 64, 65, 69, 77.  Defendants argue that these allegations fail to satisfy Rule 9(b), and fail to demonstrate that the Prospectus was "materially" false and misleading.  However, Rule 9(b) is inapplicable, and it is not "obvious" that a "reasonable

---

[14]  Defendants also quibble over the definition of "customer" and "customer base."  These types of arguments are more appropriate for summary judgment or trial than a Rule 12(b)(6) motion to dismiss.

investor" would have found this information immaterial.[15] Consequently, Plaintiffs have adequately alleged that the Prospectus was materially false and misleading with respect to this matter.

Thus, Plaintiffs have sufficiently alleged that the Prospectus was materially false and misleading with respect to at least three matters. The court need not consider whether Plaintiffs have adequately alleged that the Prospectus was materially false and misleading with respect to other matters. See Cooper v. Pickett, 137 F.3d 616, 623 (9th Cir. 1997) ("Since we conclude that, if proved, many of the allegations of the complaint state causes of action, we need not at this juncture in the case opine on some of the closer questions, such as whether the rosy forecasts were known to be false and are therefore actionable. These judgments should be made after discovery is complete."); In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096, 1118 (D. Nev. 1998) (same). See also Sutton v. Bernard, 2001 U.S. Dist. LEXIS 11610, at *14 (N.D. Ill. Aug. 6, 2001) ("Nonetheless, we need not parse through each and every alleged misstatement contained in the complaint to determine if it is actionable. It is sufficient for pleading purposes that at least some of the GAAP violations (and other material misstatements and omissions) alleged by plaintiffs are actionable."); In re Oxford Health Plans, Inc., 187 F.R.D. 133, 141 (S.D.N.Y. 1999) (if court has concluded that some of the statements in document are actionable, "it is unwise" at the pleading stage for "the Court to parse out potentially no statements and at most only very few statements [as not actionable] while other statements remain[] in the case to be tried."). Accordingly, the court rejects Defendants' argument that

---

[15] Defendants also argue that Plaintiffs' allegation that DDi's business was hemorrhaging in the fourth quarter of 2000 is untenable in light of the record financial results that DDi experienced in that quarter. However, this argument ignores the fact that Plaintiffs have adequately alleged that DDi's "record financial results" were inaccurate due to the alleged "accounting improprieties."

28

1  Plaintiffs have failed to allege any false and misleading statements (or omissions)

2  in the Prospectus.

3  2. Negative Causation Defense

4  Defendants also argue that Plaintiffs' Securities Act claims are barred by the

5  negative causation defense.

6  Section 11(e) of the Securities Act provides the measure of damages for

7  Securities Act claims:

> The suit . . . may be to recover such damages as shall represent the
> difference between the amount paid for the security (not exceeding
> the price at which the security was offered to the public) and (1) the
> value thereof as of the time such suit was brought, or (2) the price at
> which such security shall have been disposed of in the market before
> suit, or (3) the price at which such security shall have been disposed
> of after suit but before judgment if such damages shall be less than
> the damages representing the difference between the amount paid for
> the security (not exceeding the price at which the security was offered
> to the public) and the value thereof as of the time such suit was
> brought . . . .

17  15 U.S.C. § 77k(e).

18  Because § 11(a) imposes strict liability for misrepresentations contained in a

19  registration statement, any decline in value is presumed to be caused by the

20  alleged misrepresentation.  See Akerman v. Oryx Communications, Inc., 810 F.2d

21  336, 340 (2d Cir. 1987).  See also Casella v. Webb, 883 F.2d 805, 808 (9th Cir.

22  1989) ("the buyer need not show any causal connection between the

23  misrepresentation and his damage").  Section 11(e), however, provides the

24  following affirmative defense:

> [I]f the defendant proves that any portion or all of such damages
> represents other than the depreciation in value of such security
> resulting from such part of the registration statement, with respect to
> which his liability is asserted, not being true or omitting to state a

29

material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e).

"This defense is known as the 'negative causation defense.'" In re Dynegy, Inc. Sec. Litig., 339 F. Supp. 2d at 867 (citing Akerman, 810 F.2d at 340). "Where a defendant proves that the decline in the value of a security was not caused by the material omissions or misstatements in the registration statement, plaintiff is not entitled to recover any damages." Id. (citing Akerman, 810 F.2d at 340). "The defendant bears the burden of proof on this defense," and the burden is a "heavy" one. Id. at 867-68 (citing Akerman, 810 F.2d at 340). "Loss causation" can be used as a ground for dismissal on a Rule 12(b)(6) motion to dismiss only if the merits of the defense are "apparent on the face of [the] complaint." See In re Alamosa Holdings, Inc., 2005 WL 712001, at *30 (N.D. Tex. Mar. 28, 2005). See also Cats v. Protection One, Inc., 2001 U.S. Dist. LEXIS 25725, at *34 (C.D. Cal. June 4, 2001) (Tevrizian, J.) (same).

Defendants argue that the SAC affirmatively asserts that the alleged misrepresentations and omissions in the Prospectus were not revealed until *after* the value of DDi common stock plummeted from $22.00 per share to $.06 per share. Consequently, Defendants argue that the SAC demonstrates that the drop in value of DDi common stock was caused by something other than the alleged misrepresentations and omissions in the Prospectus. Therefore, Defendants contend, Plaintiffs' claims are barred by the negative causation defense.

Defendants' argument fails. The SAC does not affirmatively assert that the alleged misrepresentations and omissions in the Prospectus were revealed only after the value of DDi common stock plummeted. For example, it is unclear when the "accounting improprieties" were revealed or when it was disclosed that DDi had only 500 customers. Additionally, although the SAC alleges that "[i]nvestors

30

1   had no reason to believe that DDi's business began to deteriorate in late-2000 until

2   the Company filed for Bankruptcy [in 2003]," SAC ¶ 90, it also states that "[o]nce

3   DDi's financial condition became apparent, the Company's stock price fell below

4   $1.00 per share, thereby leading to DDi's . . . bankruptcy." Id. ¶ 12. The SAC is

5   at least ambiguous as to whether the alleged misrepresentations and omissions

6   regarding DDi's financial condition were revealed before or after the drop in value

7   of DDi common stock. Thus, it is not "apparent on the face" of the SAC that the

8   loss in value of DDi common stock was caused by something other than the

9   alleged misrepresentations and omissions in the Prospectus. Accordingly, the

10   court rejects Defendants' motions insofar as they rely on the negative causation

11   defense.

12                 3. Puffery, Bespeaks Caution, and the Safe Harbor Provision

13         Defendants argue that Plaintiffs' Securities Act claims must be dismissed

14   because the alleged false and misleading statements in the Prospectus are

15   protected by the puffery doctrine, the bespeaks caution doctrine, and/or the

16   PSLRA's safe-harbor provision.

17                   *a. Puffery*

18         Under the doctrine of "puffery," a corporate insider's vague expressions of

19   optimism or belief generally cannot serve as the basis for a securities law claim.

20   See Raab v. General Physics Corp., 4 F.3d 286, 290 (4th Cir. 1993); In re Verifone

21   Sec. Litig., 784 F. Supp. 1471, 1481 (N.D. Cal. 1992). This doctrine is not

22   applicable here, at least at this stage in the proceedings. For example, the three

23   above-mentioned misrepresentations in the Prospectus related to DDi's historical

24   financial results, the number of its customers, and its success in the fourth quarter

25   of 2000. They did not relate to "a corporate insider's vague expression of

26   optimism or belief." Furthermore, the court need not determine at this stage

27   whether various other alleged misstatements in the Prospectus are protected by the

28   puffery doctrine. See Cooper, 137 F.3d at 623 (9th Cir. 1997); In re Stratosphere

1 Corp. Sec. Litig., 1 F. Supp. 2d at 1118. See also Sutton, 2001 U.S. Dist. LEXIS

2 11610, at *14 ("Nonetheless, we need not parse through each and every alleged

3 misstatement contained in the complaint to determine if it is actionable. It is

4 sufficient for pleading purposes that at least some of the GAAP violations (and

5 other material misstatements and omissions) alleged by plaintiffs are actionable.");

6 In re Oxford Health Plans, Inc., 187 F.R.D. at 141 (if court has concluded that

7 some of the statements in document are actionable, "it is unwise" at the pleading

8 stage for "the Court to parse out potentially no statements and at most only very

9 few statements [as not actionable] while other statements remain[] in the case to be

10 tried.").

11 　　　　　　　　　　*b. Bespeaks Caution and the Safe Harbor Provision*

12 　　　　　　The "bespeaks caution doctrine" provides protection for optimistic

13 projections accompanied by cautionary language containing relevant specific facts

14 or assumptions. In re Worlds of Wonder Sec. Litig. ("WOW"), 35 F.3d 1407,

15 1413 (9th Cir. 1994). The doctrine arises from the application of two fundamental

16 concepts in securities fraud cases: materiality and reliance. Id. at 1414. When

17 appropriate cautionary language accompanies forward-looking statements, the

18 materiality of the forward-looking statements and the reasonableness of reliance

19 are affected. Id.

20 　　　　　　The PSLRA's "safe harbor" provision amended the Securities Act, see 15

21 U.S.C. § 77z-2, and the Exchange Act, see 15 U.S.C. § 78u-5. Similar to the

22 judicially-created bespeaks caution doctrine, these sections provide protection to

23 "forward-looking statements." See In re Infonet Serv. Corp. Sec. Litig. ("In re

24 Infonet"), 310 F. Supp. 2d 1080, 1103 (C.D. Cal. 2003). The safe harbor

25 provision provides that a forward-looking statement cannot be the basis of liability

26 under the Securities Act or the Securities Exchange Act if: (1) the statement is

27 identified as forward-looking and is accompanied by sufficient cautionary

28 statements, 15 U.S.C. § 78u-5(c)(1)(A); or (2) the person who made the

1  forward-looking statement did so without actual knowledge that the statement was

2  false or misleading, 15 U.S.C. § 78u-5(c)(1)(B).

3      Neither the bespeaks caution doctrine nor the safe harbor provision bars

4  Plaintiffs' Securities Act claims, at least at this stage in the proceedings. As

5  mentioned, Plaintiffs have adequately alleged that the Prospectus misrepresented

6  DDi's historical financial performance, as well as the number of its customers.

7  Neither of these alleged misrepresentations were "forward looking."

8  Consequently, the bespeaks caution doctrine and the safe harbor provision are

9  inapplicable. See In re WRT Energy, 2005 WL 323729, at *8 (S.D.N.Y. Feb. 9,

10  2005) ("[A]pplication of the 'bespeaks caution' doctrine is limited only to

11  forward-looking representations, not misrepresentations of present or historical

12  facts.") (citing P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 96-97 (2d Cir.

13  2004)); In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 340 (S.D.N.Y.

14  2001) (safe-harbor provisions "apply to forward-looking statements only, and not

15  to material omissions or misstatements of historical fact").[16]

16      Thus, Plaintiffs have alleged that the Prospectus was materially false and

17  misleading with respect to at least three matters. Furthermore, Plaintiffs'

18  allegations regarding these matters are not barred by the negative causation

19  defense, the puffery doctrine, the bespeaks caution doctrine, or the safe harbor

20  provision. Accordingly, despite Defendants' arguments to the contrary, Plaintiffs

21

22

23      [16] The court need not determine at this time whether other alleged misstatements and omissions in the Prospectus are rendered inactionable by the bespeaks caution

24  doctrine and/or the safe harbor provision. See Cooper, 137 F.3d at 623 ("Since we conclude that, if proved, many of the allegations of the complaint state causes of action,

25  we need not at this juncture in the case opine on some of the closer questions, such as whether the rosy forecasts were known to be false and are therefore actionable. These

26  judgments should be made after discovery is complete."); In re Stratosphere Corp. Sec.

27  Litig., 1 F. Supp. 2d at 1118. See also Sutton, 2001 U.S. Dist. LEXIS 11610, at *14; In re

28  Oxford Health Plans, Inc., 187 F.R.D. at 141.

1 have sufficiently alleged a § 11 claim on behalf of those who purchased DDi

2 common stock pursuant to or traceable to the Prospectus.

3 **D. Section 12(a)(2) Claim**

4 Plaintiffs assert a claim under § 12(a)(2) of the Securities Act against Bain,

5 certain Individual Defendants (Gisch, McMaster, Dimick, Halvorson, and Peters),

6 and the Underwriter Defendants.  Section 12(a)(2) makes it unlawful for any

7 person to use any instrumentality of interstate commerce to offer or sell securities

8 by means of a prospectus or oral communication that includes "an untrue

9 statement of a material fact or omits to state a material fact necessary in order to

10 make the statements, in the light of the circumstances under which they were

11 made, not misleading." 15 U.S.C. § 77l(a)(2).  Defendants argue: (1) that

12 Plaintiffs' entire § 12(a)(2) claim must be dismissed because the SAC fails to

13 plead that the Prospectus contained a material false and misleading statement,

14 (2) that the § 12(a)(2) claim must be dismissed insofar as it is asserted on behalf of

15 those who purchased DDi common stock "traceable to" the Prospectus, (3) that the

16 § 12(a)(2) claim must be dismissed insofar as it is asserted against Bain and the

17 Individual Defendants because these parties were not "offerors" or "sellers" under

18 § 12(a)(2), and (4) that the § 12(a)(2) claim must be dismissed insofar as it is

19 asserted against the Underwriter Defendants because Plaintiffs have failed to

20 allege which particular underwriter sold them DDi common stock.

21 1. <u>Material False and Misleading Statements in Prospectus</u>

22 As mentioned, Plaintiffs have adequately alleged, under Rule 8(a), that the

23 Prospectus was materially false and misleading with respect to at least three

24 matters.  First, Plaintiffs have sufficiently alleged that "accounting improprieties"

25 materially skewed the financial results contained in the Prospectus.  <u>See</u> <u>supra</u> Part

26 IV.C.1.  Second, Plaintiffs have adequately alleged that the Prospectus materially

27 misrepresented the number of DDi customers.  <u>See id.</u>  Third, Plaintiffs have

28 sufficiently alleged that the Prospectus materially misrepresented the state of

1   DDi's business. See id. Accordingly, Defendants' motions are denied insofar as

2   they assert that Plaintiffs have failed to allege any materially false and misleading

3   statements in the Prospectus.

4       2.  Section 12(a)(2) Claim Asserted on Behalf of Those Who Purchased DDi

5                    Common Stock "Traceable To" the Prospectus

6       Defendants argue that Plaintiffs' § 12(a)(2) claim must be dismissed insofar

7   as it is asserted on behalf of those who purchased DDi common stock "traceable

8   to," rather than "pursuant to," the Prospectus. "[P]urchasers in private or

9   secondary market offerings are precluded from bringing actions under Section

10  12(a)(2)." In re Sterling Foster & Co. Inc., Sec. Litig., 222 F. Supp. 2d at 244.

11  See also In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 693-94 (S.D.N.Y.

12  2000) (same).  Therefore, Plaintiffs' § 12(a)(2) claim is dismissed with prejudice

13  insofar as it is asserted on behalf of those who purchased DDi common stock in

14  private or secondary market offerings.

15      3.  Section 12(a)(2) Claim Asserted Against Bain and the Individual Defendants

16      Section 12(a)(2) imposes liability on a person who "*offers* or *sells* a security

17  . . . by means of a prospectus . . . which includes an untrue statement of material

18  fact or omits to state a material fact." 15 U.S.C. § 77l(a)(2) (emphasis added).  A

19  person "offers or sells" a security within the meaning of § 12(a)(2) if the person

20  either: (1) passes title to the securities to the plaintiff, or (2) solicits the purchase,

21  motivated in part by his own financial interests.  See Moore v. Kayport Package

22  Express, Inc., 885 F.2d 531, 536 (9th Cir. 1989). See also In re Infonet, 310 F.

23  Supp. 2d at 1100; Griffin v. Paine Webber, Inc., 2001 U.S. Dist. LEXIS 8937, at

24  *4 (S.D.N.Y. June 29, 2001).  Bain and the Individual Defendants argue that they

25  were not "offerors" or "sellers" under § 12(a)(2).

26      First, Bain and the Individual Defendants assert that they did not "pass title

27  to the securities to the plaintiff[s]" because the Offering occurred via a firm

28  commitment underwriting.  Courts have held that "the issuer and its directors and

35

1  officers [and selling shareholders] do not pass title to persons who buy in [a] firm

2  commitment underwriting." In re Infonet, 310 F. Supp. 2d at 1100. "Instead, title

3  is passed to buyers by the underwriters." Id. The Offering here was a firm

4  commitment underwriting. See Prospectus at 78. Consequently, Bain and the

5  Individual Defendants did not "pass title to the securities to the plaintiff[s]."

6  　　　Second, Bain and the Individual Defendants argue that they did not

7  "solicit[] the purchase [of the securities], motivated in part by [their] own financial

8  interests." Indeed, the facts alleged in the SAC indicate that Bain and the

9  Individual Defendants, at most, assisted in preparing and issuing the Prospectus.

10  See SAC ¶ 103. As explained in In re Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d

11  1096 (D. Nev. 1998), a defendant's "simple involvement" in the preparation of a

12  registration statement is insufficient to establish the sort of relationship between a

13  buyer and seller required for liability under § 12(a)(2). Id. at 1121. Similarly,

14  "merely proving that [the defendants] signed the allegedly misleading registration

15  statement or prospectus for a firm commitment offering is insufficient to prove

16  that [they] were sellers under section 12." Id. at 1120. See also In re Infonet, 310

17  F. Supp. 2d at 1101 (same); In re Musicmaker.com Sec. Litig., 2001 WL

18  34062431, at *14 n. 9 (C.D. Cal. June 4, 2001) (Snyder, J.) (same); Thomas Lee

19  Hazen, Treatise on the Laws of Securities Regulation § 7.2 (4th ed. 2002) ("Even

20  substantial involvement in the preparation of registration and offering materials

21  will not create liability unless there is also active involvement in the negotiations

22  leading to the sale in question.").[17] Thus, Plaintiffs have failed to allege that Bain

23

24  　　　[17] Plaintiffs request that the court ignore this precedent and side with those courts

25  holding that § 12(a)(2) automatically extends liability to officers and directors who sign
the prospectus and registration. See, e.g., In re National Golf Properties Inc. Sec. Litig.,

26  2003 U.S. Dist. LEXIS 4321, at *9 (C.D. Cal. Mar. 18, 2003) (King, J.); In re Proxima

27  Corp. Sec. Litig., 1994 WL 374306, at *5 (S.D. Cal. May 3, 1994); Keegan Mgt. Co. Sec.
Litig., 1991 WL 253003, at *8 (N.D. Cal. 1991). The court declines this invitation for the

28  reasons set forth in In re Infonet, 310 F. Supp. 2d at 1100-02.

1   and the Individual Defendants "solicited" the purchase of securities in the

2   Offering.  Accordingly, Plaintiffs have failed to allege that Bain and the Individual

3   Defendants were "offerors" or "sellers" under § 12(a)(2), and Plaintiffs' § 12(a)(2)

4   claim against these defendants is dismissed without prejudice.

5           4.  <u>Section 12(a)(2) Claim Against the Underwriter Defendants</u>

6           The Underwriter Defendants argue that Plaintiffs' § 12(a)(2) claim against

7   them must be dismissed because Plaintiffs have failed to allege which particular

8   underwriter sold them DDi common stock in the Offering.  Section 12(a)(2)

9   requires privity between a plaintiff and the seller of the securities at issue – it

10   permits suit against the seller of a security only by "the person purchasing such

11   security from him."  15 U.S.C. § 77l(a)(2); <u>In re Itel Sec. Litig.</u>, 89 F.R.D. 104,

12   116 (N.D. Cal. 1981) ("§ 12 contemplates only an action by a buyer against his

13   immediate seller") (citations omitted).  "Therefore, this privity requirement means

14   that if a plaintiff wishes to sue a seller of stock under § 12(a)(2), he must have

15   bought the stock from that seller; a plaintiff cannot sue a seller from whom he did

16   not purchase."  <u>Danis v. USN Communications, Inc.</u>, 189 F.R.D. 391, 400 (N.D.

17   Ill. 1999).

18           Representative plaintiff Watson alleges that he "acquired 100 shares of DDi

19   common stock [from one of the underwriters] in the February Offering pursuant to

20   the Prospectus."  SAC ¶ 20.  He does not allege which underwriter(s) sold him

21   these 100 shares.  Consequently, the Underwriter Defendants argue that Plaintiffs,

22   apparently represented by Watson with respect to this matter, cannot assert a

23   § 12(a)(2) claim against any particular underwriter.

24           In <u>In re Westinghouse Sec. Litig.</u> ("<u>In re Westinghouse</u>"), 90 F.3d 696 (3d

25   Cir. 1996), the Third Circuit rejected this argument.  <u>Id.</u> at 717-19.  The plaintiffs

26   in <u>In re Westinghouse</u> alleged that "[e]ach member of the Underwriter Class sold

27   [company] stock to members of the [plaintiff] class" and that "the underwriter

28

1   defendants sold [the] securities 'directly to plaintiffs and other Class members.'"

2   Id. at 717.  The district court dismissed the plaintiffs' § 12(a)(2) claim, holding:

3
4       [P]laintiffs must allege, to state a viable Section 12(2) cause of action,
        that the underwriter defendants were "sellers" within the meaning of
5       Section 12(2).  That is, there must be an allegation that a particular
        proposed defendant sold or solicited the sale of [the company's]
6       securities to the individual plaintiffs.  This element is lacking.

7
8   Id. at 718 (quoting district court opinion).

9       The Third Circuit reversed, stating that although it "agree[d] with the

10  district court that plaintiffs must allege that the underwriter defendants were

11  section 12(2) sellers," there was no support "for the district court's statement that,

12  in order to achieve this, plaintiffs are required [at the pleading stage] to allege

13  which underwriter sold securities to each plaintiff."  Id.  The court stated that

14  "absent a particularity requirement, plaintiffs must provide a short and plain

15  statement showing that the underwriter defendants are statutory sellers and that

16  plaintiffs purchased securities from them."  Id.  The court found that the plaintiffs'

17  allegations satisfied this lenient standard:

18
19      We find that plaintiffs satisfied this requirement and stated a section
        12(2) claim against the underwriter defendants.  Taken in the light
20      most favorable to plaintiffs, the first amended complaint alleges that
        each of the underwriter defendants sold [the company's] securities
21      directly to plaintiffs and that each plaintiff purchased [the company's]
22      securities directly from an underwriter defendant.

23  Id.

24      The court finds In re Westinghouse persuasive.  Furthermore, Plaintiffs'

25  allegations are similar to those proffered by the plaintiffs in In re Westinghouse.

26  For example, Plaintiffs allege that each of the Underwriter Defendants sold DDi

27  common stock directly to certain plaintiffs in the Offering, see SAC ¶¶ 36-39, and

28

that these plaintiffs, including Watson, purchased the common stock directly from an underwriter defendant.  See id. ¶¶ 20, 42-43.  Furthermore, as noted in In re Westinghouse, Plaintiffs need not allege "which underwriter sold securities to each plaintiff."  Thus, Plaintiffs have adequately alleged that the Underwriter Defendants were statutory sellers under § 12(a)(2).  Accordingly, the court rejects Defendants' argument that Plaintiffs' § 12(a)(2) claim against the Underwriter Defendants must be dismissed because Plaintiffs have failed to plead which particular underwriter sold them DDi common stock.[18]

### E.  Section 15 Claim

Plaintiffs assert a claim under § 15(a) of the Securities Act against Gisch, McMaster, Dimick, Halvorson, Peters, and Bain.  Section 15(a) imposes joint and several liability upon every person who controls any person liable under sections 11 or 12.  15 U.S.C. § 77o.  Section 15(a) provides:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Id.  "To state a claim under this section, a plaintiff must allege that the . . . defendants had power or influence over the company and that the . . . defendants

---

[18]  Insofar as Defendants' argument is related to "standing," In re Westinghouse states that this concern is better addressed during the class certification stage in the proceedings.  See In re Westinghouse, 90 F.3d at 718 n. 22.  See also Danis v. USN Communications, Inc., 189 F.R.D. 391, 400 (N.D. Ill. 1999) (addressing argument at class certification stage).

1  were culpable participants in the company's alleged illegal activity." In re Daou,

2  397 F.3d at 725.  Bain contends that it is not a "controlling person" because it

3  meets neither of these requirements.  The court disagrees.[19]

4        First, the Prospectus itself indicates that Bain "had power or influence over"

5  DDi at the time that DDi issued the Prospectus.  In particular, the Prospectus

6  provided:

7
> Our current principal stockholders will continue to have significant
> influence over our business after this offering . . . .  Upon completion
> of this offering, . . . investment funds affiliated with Bain Capital, Inc.
> will beneficially own approximately 14.2% of our outstanding
> common stock.  In addition, of the eight directors who serve on our
> board, three are current representatives of Bain Capital, Inc. and two
> are former representatives of Bain Capital, Inc.  By virtue of such
> stock ownership and board representation, these entities will continue
> to have a significant influence over all matters submitted to our
> stockholders, including the election of our directors, and to exercise
> significant control over our business, policies and affairs.

16  Prospectus at 12.  See also id. at 66 ("Five of our directors are or were affiliated

17  with our principal stockholder, the Bain Capital funds."); id. at 68 (Bain held

18  20.4% of DDi common stock before Offering).  Given the liberal pleading

19  standard imposed by Rule 8(a), this statement in the Prospectus is sufficient at this

20  stage in the proceedings to demonstrate that Bain "had power or influence over"

21

22  ────────────────

23  [19]  The defendants named in this claim also argue that they cannot be held liable
      under § 15(a) because DDi, the allegedly "controlled" entity, is not named in this suit.

24  The court need not address this argument because it was raised for the first time in
      Defendants' reply briefs.  See In re Intuit Privacy Litig., 138 F. Supp. 2d 1272, 1275 n. 3

25  (C.D. Cal. 2001) ("this court does not consider arguments raised anew for the for first

26  time in a reply brief as to so do would unfairly deny the non-moving party an opportunity
      to respond").  Defendants additionally argue that they cannot be held liable under § 15(a)

27  because there is no underlying violation of § 11 or § 12.  This argument fails, as certain

28  portions of Plaintiffs' § 11 and § 12 claims survive the instant motions to dismiss.

DDi at the time the Prospectus was issued.  Cf. No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003) ("Whether [the defendant] is a controlling person is an intensely factual question . . . .").

Second, Plaintiffs have alleged that Bain was a "culpable participant" in the alleged wrongful conduct.  For example, Plaintiffs allege that Bain "control[led] the contents of the . . . Prospectus," but did not "ma[ke] a reasonable investigation or possess[] reasonable grounds for the belief that the statements contained in the . . . Prospectus were true and devoid of any omissions of material fact."  SAC ¶¶ 111, 113.  Given Rule 8(a)'s liberal pleading standard, this allegation is sufficient.  Thus, Plaintiffs have adequately alleged that Bain was a "controlling person" under § 15(a).

## V.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are **GRANTED** in part and **DENIED** in part.  First, Plaintiffs' claims asserted on behalf of those who purchased the Convertible Notes are time-barred and are dismissed with prejudice.  Second, Defendants' motions to dismiss Plaintiffs' § 11 claim asserted on behalf of those who purchased DDi common stock pursuant to or traceable to the Prospectus are denied.  Third, Defendants' motions to dismiss Plaintiffs' § 12(a)(2) claim insofar as it is asserted on behalf of those who purchased DDi common stock in private or secondary market offerings are granted; this portion of Plaintiff's § 12(a)(2) claim is dismissed with prejudice.  Fourth, Defendants' motions to dismiss Plaintiffs' § 12(a)(2) claim against Bain and the Individual Defendants are granted; this portion of Plaintiff's § 12(a)(2) claim is dismissed without prejudice.  Fifth, the Underwriter Defendants' motion to dismiss Plaintiffs' § 12(a)(2) claim against them is denied.  Sixth, Defendants' motions to dismiss Plaintiff's § 15(a) claim are denied.

1  No later than August 8, 2005, Plaintiffs shall file either an amended

2  complaint or a notice confirming that the SAC will remain the operative

3  complaint.  If Plaintiffs choose the latter course of action, Defendants shall file an

4  answer by August 29, 2005.

5

6  IT IS SO ORDERED.

7  DATED: July 20, 2005

8

9

10                                Nora M. Manella
                                  United States District Judge
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28